# FLORENCE MAE JOHNSON v. ELMER LARSON AND OTHERS.[1]

July 13, 1951.

Nos. 35,417, 35,418, 35,419.

[1]Reported in 49 N. W. (2d) 8.

506

*W. B. Sherwood* and *Harvey H. Palmer,* for appellant Elmer Larson.

*Smith & Becklund,* for appellant Theodore C. Peterson.

*Dancer, Montague, Applequist & Lyons,* for appellant Klemet Harvik Haukaas.

*Herbert E. Olson* and *Romaine Powell,* for respondent.

MAGNEY, JUSTICE.

Defendant Elmer Larson operates a garage in the village of Spooner. In connection with his business, he owns a wrecker truck. Defendant Theodore C. Peterson is the owner of a sedan. Defendant Klemet Harvik Haukaas is the owner of a pickup truck.

On the evening of May 3, 1947, about 9 p. m., defendant Larson had his wrecker headed in a northeasterly direction across the south lane of state highway No. 11 within the village limits of Baudette. By a cable and chain, his wrecker was attached to a car in the south ditch of the highway. The highway runs east and west. Defendant Peterson, driving west, passed Larson and his wrecker and stopped on the north lane of the highway. Plaintiff was a passenger in the Haukaas truck, which was being driven

east by its owner. The truck collided with the wrecker, and plaintiff was seriously injured.

Plaintiff claims that all three of the defendants were negligent and that their concurrent negligence was the proximate cause of the accident. Each defendant denies that he was negligent and claims that the accident was caused by the negligence of one or more of his codefendants.

The jury returned a verdict of $35,847.45 against all the defendants. Each appeals from an order denying his alternative motion for judgment or a new trial.

From shoulder to shoulder the tarvia-paved highway is 28 feet wide. Each shoulder is four feet wide. About 269 feet west from the place of accident is a long curve to the northwest. The driver of a car coming from the west around the curve can see cars to the east on the straightaway beyond the curve. The place of the accident is within the village limits of Baudette, but outside the business section and between 2,400 and 2,500 feet from its west boundary.

■ The charge of negligence that plaintiff makes against defendant Larson is that he parked his wrecker diagonally across the south lane of the highway in such a way that drivers from either direction would be unable to see his headlights, taillights, or other lights, and that, although it was nighttime and dark, he failed to put out flares. Larson had flares with him and neglected to use them. It would serve no useful purpose to discuss the question whether the jury was justified in finding Larson guilty of negligence. Clearly, the jury could find that he was negligent and that his negligence continued to operate until the cars collided. No intervening efficient cause intervened to cancel out his negligence.

The charge of negligence which plaintiff makes against defendant Peterson is that he parked his car on the north lane of the highway with his lights on high beam, which were described as "exceedingly bright." Peterson claims that his car was parked about 120 feet west of the wrecker, while there is evidence that it was only one or two car lengths therefrom. He admits that he was parked on

the north lane, but denies that his lights were on bright. If his lights were on high, and he did not dim them for oncoming traffic, it is evident that they created a hazard by blinding oncoming drivers. Defendant Haukaas testified that he was blinded by the lights. Whether Peterson was parked one or two car lengths from the wrecker or about 120 feet or more, as he claims, the blinding effects of his bright headlights would be the same, but the farther away he was from the wrecker the better would be the opportunity for the other drivers to see the wrecker across his lane of travel after having passed the car with the blinding lights. The court submitted the question of Peterson's negligence to the jury, and also the question whether such negligence, if any were found, was a proximate cause of the accident. We see no error in the submission, and there is sufficient evidence to sustain the verdict against defendant Peterson.

The charge of negligence which plaintiff makes against defendant Haukaas is that he was operating his truck at an excessive and unlawful rate of speed. The accident happened within the village limits of Baudette and a few feet east of a 30-mile-per-hour speed-limit sign. The testimony of Haukaas himself is that he was driving about 40 miles an hour until he came to about the place where there was a 40-mile-an-hour speed-limit sign, when he slowed down to approximately 35 miles an hour. He testified:

"* * * There was a car sitting on the north lane, facing west. * * * the lights were on high beam, exceedingly bright and I believe I slowed down probably five miles an hour more in that I could not see too well beyond the lights."

Rowley Haukaas, brother of defendant Haukaas, who sat on the right-hand side of the seat in the truck, testified that the speed of the truck as it passed the car parked on the westbound lane was about 35 miles an hour and that they were going at that speed at the time of the accident. Plaintiff testified that the last she remembers was when they were rounding the curve, and that the speed of the truck at that time was between 30 and 35 miles an

hour. She does not know what the speed was at the time of the accident. Nels Kofstad, who watched the truck during the time it traveled the last 300 or 400 feet before the collision, said that it was going between 50 and 60 miles an hour, not less than 50 miles. As further evidence of the speed of the truck, the record shows that when the truck struck the wrecker, which weighed 5,300 pounds, the wrecker was shoved northeasterly across the road 50 or 75 feet; that it stopped with its front end in the ditch on the north side of the road and the rear on the tarvia; and that the chain or cable attached to the car in the south ditch had been pulled away from it. The accident happened within the village limits of Baudette. M. S. A. 169.14, subd. 2, reads:

"Where no special hazard exists the following speeds shall be lawful, but any speeds in excess of such limits shall be prima facie evidence that the speed is not reasonable or prudent and that it is unlawful; except that *any speed limit within any municipality shall be an absolute speed limit and any speed in excess thereof shall be unlawful:*

"(1) 30 miles per hour in any municipality;" (Italics supplied.)

On the testimony detailed above and the statute quoted, the verdict of the jury as against Haukaas is sustained on the question of negligence. The other feature on Haukaas's liability concerns itself with proximate cause. Haukaas contends that, even if he may be found negligent on the evidence as to his speed, his negligence, if any, was not a proximate cause of the accident. He testified that the blinding lights on the Peterson car affected his vision so that he was unable to see the wrecker until after he had passed the Peterson car, and that the wrecker was only 25 or 30 feet east of the Peterson car. And, as stated, Larson had not set out flares as the statute required him to do. Although we have hesitation in holding that the jury's finding that the negligence of Haukaas was a proximate cause of the accident, in our opinion, there is sufficient basis in the evidence for its finding. No complaint is made as to the manner in which the question of proximate

cause was submitted to the jury. The evidence abundantly supports the claim that Haukaas was negligent. He violated the statute covering the speed of motor vehicles within the limits of municipalities. One witness testified that he was standing by the side of the road and watched Haukaas's approach for 300 or 400 feet up to the time of the accident and that he was traveling at a rate of 50 to 60 miles an hour in a 30-mile zone. Although the question is a close one, we are not prepared to say, in view of all the evidence, that this negligence on the part of Haukaas was not a proximate cause as a matter of law.

■ At the close of the opening statement, counsel for defendant Haukaas made a motion for dismissal of the action on the ground that, assuming the proof would conform to counsel's opening statement as to defendant Haukaas, there was no negligence on his part. The court denied the motion, and properly so. A dismissal at the close of plaintiff's opening statement is rarely granted, and the power to dismiss in such a case is to be sparingly exercised. It is true in this case that counsel for plaintiff did not state facts showing negligence on the part of Haukaas, but neither did he state facts which, if proved, would not entitle plaintiff to a verdict. Such motion is only granted in those cases where counsel has deliberately conceded facts which, if proved, would not entitle plaintiff to a verdict, and then only after counsel has been given every opportunity to qualify, explain, and amplify his statements. Barrett v. M. St. P. & S. S. M. Ry. Co. 106 Minn. 51, 117 N. W. 1047, 18 L.R.A.(N.S.) 416; St. Paul Motor Vehicle Co. v. Johnston, 127 Minn. 443, 149 N. W. 667; Mahutga v. M. St. P. & S. S. M. Ry. Co. 182 Minn. 362, 234 N. W. 474; Plotkin v. Northland Transp. Co. 204 Minn. 422, 283 N. W. 758. The court properly denied the motion to dismiss at the close of plaintiff's opening statement.

■ The verdict was for $35,847.45. All defendants claim that it is so excessive that a new trial should be granted. In many cases which come to this court the verdicts are so large that we are troubled with the question which they raise. We all realize the effect which inflation has upon the value of the dollar. Some verdicts,

however, are so large that inflation alone cannot account for their size, and there may be nothing in the record of a prejudicial nature that gives any basis for oversized verdicts. We find nothing in the record in the instant case that could occasion passion and prejudice. It was tried on a high plane without any of the deliberately planned tactics calculated, with the verdict in view, to create passion and prejudice—a situation irritating to a reviewing court. The trial in this case was eminently fair. We shall therefore examine the evidence to determine whether the size of the verdict itself is such that we must conclude that it was given under the influence of passion and prejudice.

Plaintiff was 22 years of age at the time of the accident. She was 25 years of age at the time of trial. Her home was on a farm. She graduated from high school in June 1944 at the age of 19. It is not disputed that before the accident she was a fine looking, attractive girl.

As a result of the accident, she was knocked unconscious. She was taken to the office of Dr. A. A. Brink. Her face was then so bloody that she was unrecognizable. There were multiple lacerations and cuts about her right eye, through the nose, through the left and right upper lip, and on her left knee. These lacerations and cuts were sutured. There were abrasions and contusions on her forehead, cheek, and underneath the chin, and dislocation of her chest. She was at the hospital two weeks. She could not breathe through her nose for at least a week, and after that her breathing was painful. During her stay at the hospital she had to eat through a straw. The upper lid of her right eye was lifted up by the injury, and the underlying tissue, called the tarsal body, which gives body to the eyelid, was destroyed, resulting in a drooping eyelid. Dr. Brink testified:

"* * * It was so lacerated and in such bad shape I couldn't repair it properly. I tried to repair it the best I could, and as you see, the result is very poor."

This drooping eyelid is a permanent condition. When plaintiff tries to look up, this drooping eyelid is, as the doctor describes it, "a mechanical block—she can't see through her skin." She has scars to the left of the bridge of her nose and one scar which starts at the septum of the nose and extends laterally down to her right upper lip. Another extends from the septum of her nose laterally to the left upper lip. The scars are permanent, as is a swelling between the scars. The swelling is due to loss of blood vessels in her lip. Her lip becomes cold easily, and so does the end of the nose, caused by poor circulation in the area of the nose and lip. The left upper lip droops. The right eyelid and the upper lip swell, also because of poor circulation. Plaintiff had a fairly deep laceration over the anterior part of her knee, which left a scar about two and a half or three inches long below the left kneecap. She has a bump on her chest over half an inch high. She still suffers pain at the point of the lacerations. She suffers from headaches caused by the concussion at the time of the accident, and this may last for several years. Her special damages amounted to $931.45. She went to Rochester three times and submitted to plastic surgery in a futile effort to reduce her disfigurement. Before the accident, she had planned to attend a beauty culture school in Fargo, but after the accident she gave up the idea.

There has been a change in plaintiff's personality because of the accident. Before the accident she was described as being a "jolly sort." She enjoyed attending dances, where she danced every dance. She also attended parties and shows. She seldom appeared in public after the accident, because she felt self-conscious and thought everyone was looking at her. As to her condition and her outlook on life, she said, "I always think about it." She is so emotionally upset that she often cries. She had a few facial blemishes before the accident caused by acne. Since the accident they have become more pronounced, and pitting in her face has increased. This can be caused by emotional factors.

The description which the record gives us of the drooping eyelid, the puffed lip, and the scars heretofore described indicates that

plaintiff's attractiveness has been largely destroyed. Such a loss is difficult to measure in dollars. Attractiveness is a valuable asset to any woman. The more desirable positions open to women are practically closed to one with a disfigured face. Plaintiff's chances in the matrimonial market are also limited. This, together with her changed personality, which has transformed a young woman from a "jolly sort" to a self-conscious brooding one, plus the pain and suffering and special damages, have led us to the conclusion that, although the verdict is liberal, probably considerably larger than we would have awarded had we been passing on the facts, it should not be disturbed. The jury and the court were in a position to see the damage that has been caused to this individual because of the accident, and the trial court did not see fit to set the verdict aside as excessive.

■ Defendants question the correctness of the court's ruling in receiving in evidence exhibit B, a photograph of plaintiff taken at the time she graduated from high school at 19 years of age, six years prior to the trial. There is testimony that there was little change in her appearance from the time the picture was taken up to the time of trial six years later. A verbal description of plaintiff prior to the accident could not possibly convey to the jury her appearance at that time. Since one of the items of damage, and the most important one, was the loss of attractiveness, we feel that the court did not abuse its discretion in receiving the exhibit in evidence. 3 Wigmore, Evidence (3 ed.) § 792; State v. Dimler, 206 Minn. 81, 287 N. W. 785.

We find no errors that require a reversal.

Orders affirmed.